Good morning. May it please the Court, I'm Katherine Hazard here on behalf of the National Marine Fisheries Service. I'd like to take 17 minutes at the start. Kristin Monsalverg, Center for Biological Diversity would like 5 minutes and then I'd like to retain the 8 minutes for rebuttal. Okay, I will try and help you. We ask this Court to reverse the District Court's ruling and uphold the lifting the Arctic Ring Seal as a threatened species. NIMS based the listing on the best available science and there are two key aspects to its determination. One is that the seals are highly dependent on snow caves and the sea ice for pup survival and the second is its projections about the ongoing diminishment of snow on sea ice. Ms. Hazard, can I stop you for just a minute? It looks to me like if the case stands we're pretty well bound by our sister panel's decision and the other case. Should we reserve ruling on this matter until we see whether the Supreme Court grants cert on that case and can you tell us what the status is of the pending cert petition? Yeah, the plaintiff's petition for cert, we have filed our opposition to cert and they haven't filed their reply yet so it will probably be a month or so. Did the Court ask for a response on the petition for certiorari or did the Department file one? We just filed one. It may make sense to hold it until there's a determination because as you know, the issues overlap a lot. Obviously, this is a different species and there's a different record. But they're all snow ice dependent species, are they not? They're all ice dependent species. The bearded seal, which is the other case, is not snow dependent. The ringed seal is snow dependent and so the sea ice modeling in this case and in the bearded seal case are the same. And the District Court essentially made the same ruling in both cases, did it not? It did, yeah. It seems to me that the prudent thing to do would be to wait and see whether that decision stands. I would agree with that. Okay, can I ask you this just about the difference between this case and that one? Yes, there's the added component of the snow here but to matter at all, the snow has to have the ice, right? So that's why I guess I just didn't see that there's a lot of fights over whether the snow modeling is reliable and the like. But it didn't seem as though that really added much because you still have the problem that if there's no ice there, it doesn't really matter how much it snows. Am I right on that? That even though that's a difference in this case, it doesn't really distinguish it from the other case because it's the same underlying problem that there just won't be enough ice there to support populations of the seals? Well, yes, it needs ice to have the snow cover to provide the habitat. But I guess the analysis of the agency is different here and our view is that each record has to be evaluated on its own for each species. So while the sea ice modeling is the same and the loss of the sea ice means, as you suggest, that there won't be habitat for the seals, here, the really crucial modeling for this species had to do with snow cover. But that's what I'm asking, why? When I approached this case, I saw all the fights over the snow modeling and I think actually the plaintiffs have some legitimate points there. But it seems to me it ultimately didn't matter given our decision in the earlier case because the earlier case upheld all the right. And if you don't have the ice for the snow to fall on, then it just seems like it's not the snow's not doing any good. So why do we care? I mean, I understand that the snow is an extra wrinkle, but it just seems like it didn't really matter in terms of distinguishing this case from that one, because if there's no ice there, the seal is not going to. Right. Well, it's not that there won't be any ice. So, I mean, I would love to be able to agree with you because I think that would make it very easy for us to follow this case directly on that one. But I think we need to be faithful to the record here. In the other case, whatever the loss of ice is, right? I didn't see any difference between the needs of the bearded seals for the ice and the needs of these seals for the ice. So maybe I can explain that. OK, so the need for the bearded seal for the ice is that the bearded seal has to pup and nurse their young and molt, but primarily pup and nurse their young in areas that are over shallow waters so that they can feed, because they're bottom feeders. And so the Bering Sea is this highly productive area where 70% of the bearded seals pup. And it's that ice that will no longer be there during the key period for the bearded seal. It will have retracted to the north during the pupping season and will then be over high water, deeper water, or the areas where the benthic productivity is not what it is in the Bering Sea. So that was the analysis in the bearded seal case. It was the loss of the conjunction of the sea ice over the Bering Sea and the need for the access of that species to the bottom productive area. Here, this is not a bottom feeding seal. And the critical issue for this seal is that it has to have these snow layers in order for their pups to avoid predation and hypothermia. That's not the case with the bearded seal. They pup right on the ice, not in these snow caves. There was some discussion in the record about the fact that we don't know how adaptable, or excuse me, the experts seem to say that the ringed seal is pretty adaptable to changes and is, for that reason, is found in shallow waters. Let me address the resilience issue. Is the same true of the bearded seal? Is there any discussion in the record in that case as to the resiliency of that species to receding ice? Well, in that case, there was discussion about whether the seals would be able to adjust to new areas outside of the Bering Sea that may not have access. My question is, are they also resilient and somewhat flexible in adapting to? I mean, the agency had no information indicating that they are, and it has to make its determinations based on the best available science. And so when various reviewers or commenters might say, well, maybe they'll be able to pup earlier, or maybe they'll be able to pup on or maybe they'll be able to move north and adapt to a new habitat. Well, that's all speculation on their part. What the studies all show is that the Arctic ringed seal does not pup in any areas, or its pups don't survive in any areas where there is inadequate snow cover. So when they're saying, well, maybe they could adapt and adopt a land habitat for pupping, that's not what the evidence shows. There are at least six studies that show that loss to predation and hypothermia, it's about 100% pup mortality. That's at the decreased, I guess, the 10 centimeter or whatever the range was. You're saying when it gets below the 20 to 30, I think, centimeters, that then you have hypothermia and predation. Is that right? That's right. Yeah, that's 20 to 30 centimeters snow on flat ice, and that's so that it can drift to what they need for their birthing layers, which is 50 to 65 centimeters. If you get their ice ridges, then the snow will blow and accumulate. So does that address your questions about the distinction between the Arctic seal case in this case? No, that's my fault. I guess what I heard you say is that the loss of ice that's relevant in that case, it's a different set of ice than the ice that's at issue here for our seal. That's what distinguishes it. The reason I was posing the question is because it relates to Judge Thomas, but I don't understand how there's much for us to decide. The only two differences I saw is that here you had the added problems of the snow modeling, and here you had a majority of the peer reviewers disagreeing with the listing decision. But other than that, pretty much all of the arguments that are put before us were already hashed out in the other case, and if we're bound by that, then there you are. So that's what I was trying to get at. What's different about those two wrinkles? How do they affect our case, if at all? Right. So I guess the difference is, as I say, I would agree that most of the issues that the court decided in the bearded seal case would bind the court here. That is that the agency doesn't have to have numeric information or indications of population decline or extinction threshold, all of those issues. It's our reliance on the sea ice modeling out to 2100. It's explanation for changing from 2050 to 2100. All of those issues apply here with equal force. Let me ask the question that Judge Wofford just touched on. How significant is it that the peer reviewers were pretty much, what was it, four out of six or five out of six, basically said, we don't agree that the methodology supports the agency's conclusions here. Was that true also in the Pritzker case? No. What accounts for that difference? Different reviewers? It's partly different reviewers. It's partly the snow modeling, as you acknowledge. But I want to focus on what the peer reviewers' criticisms were and why NIMS rejected them. First of all, as we explained in our reply brief, there were three climate scientist peer reviewers. Two of those agreed with NIMS modeling and its conclusions about the projections out to 2100 of the snow conditions. One of them disagreed. That was Dr. Barber. He misunderstood the modeling and NIMS explained in its final rule the two ways in which he misunderstood the modeling. After receiving those peer review comments, an additional study was done, a 2012 study by Hazel. His study involved 10 snow models, which all supported NIMS determination. The peer reviewers who were reviewing the proposed rule were not reviewing this peer reviewed study by Hazel. NIMS didn't go back to the other two climate reviewers and ask them to take a look at the 2012 study to see if it changed their opinion. There was only one who disagreed. Yeah. Did the agency not go back to... No, the agency didn't go back to them. I mean, they had their own climate scientist who was involved in preparation of the biological... When you say they, who are you talking about? NIMS, I'm sorry. NIMS had its own climate scientist and... So you didn't go back to Dr. Barber is what you're saying. They didn't go back to Dr. Barber. So it may be that Dr. Barber at that point would have said, oh, well, yeah, this looks better. But what you're saying is that you had the information in the record before when you made the determination of this additional 2012. Absolutely. Yeah. And a similar thing happened in the Bearded Seal case, which the NITES circuit recognized in that decision, which is obviously the science is developing quickly in this area and there's a lot of research. And so a similar thing happened there where more recent studies on sea ice came out after the comments came in on the proposed rule and NIMS referenced that in its final decision that showed that the sea ice is retreating faster than anticipated. Counsel, maybe you can help me under... I was trying to go through the record to find out exactly what question the peer reviewers were asked, because it seems to me if you were to approach the question of agreeing with the final rule with an idea as a scientist, whether or not you could draw scientific or valid conclusions, that that's different than the standard of making a reasonable determination on the best available evidence. So can you clarify what they were actually asked as the question? Because it wasn't clear to me that when you read their reviews, that they're aligned exactly with the standard that we have to apply. Yeah, that's right, your honor. And I think it is included in the record here, what the questions they were asked are. But they were asked questions like, do you agree with the evaluation of the sea ice modeling? Do you agree that this finding adequately supports determination that this deal is threatened? But there's some more general and some more specific. So they were asked different things, is what you're saying? Yes. Yeah, and they were asked to review different sections of the proposed rule based on their expertise. Ms. Hazard, can you address the district court's 4D decision? I mean, it seems to me that it is appropriate as a factor to consider as to whether or not the agency enacted protective regulations or decided not to do so. Yeah, it is not a factor that the agency can consider or should consider in determining whether to list the ESA. Let me ask the question a different way. Why is it improper for the district court in reviewing for arbitrary and capricious decision making for the district court to look at the fact that the agency examined the problem and decided that even though it was going to list the species as threatened, that it was not going to enact any protective regulations at this time? Well, because basically the district court is then considering a factor that it's not appropriate to consider. The efficacy of listing a species is not a factor that the agency could consider, and therefore it's not a factor that the court should consider in determining whether... But it just seems common sense to me that if the agency makes a determination that a species is threatened, why wouldn't it take some action to prevent it from moving to extinction? Well, there are effects of listing that will be beneficial to the species, but that doesn't mean it needs to impose a take prohibition, which is what the 4D rule was a decision about. And obligatory. And is that driven by the fact that there are millions of the seals that currently exist and our ability to count them is limited? No, it's based on this determination that the take of seals at this time, the harvesting of seals by subsistence hunters is not affecting the population. So it's not a threat. You and I seem to be talking paths. I mean, it seems to me that if the agency is looking at the seal population and saying there are millions of them, therefore whatever the native villages are taking for subsistence purposes at this time is not going to appreciably decimate the population of ring seals. Is that what we're saying? And therefore we don't need to take any further protection, which would be to go out and take one of these seals. Right. I mean, I guess I'm trying to respond to your question based on... I'm asking it. I don't know how else to ask it. Okay. Well, I guess that we have to follow, the agency has to follow what the Congress allows it to consider in making a listing determination. For example... But I guess the question is, wouldn't the same underlying information that you rely upon or the best scientific available data that you rely upon to make a determination about the listing, wasn't that the same information that was used to determine that there wouldn't be some sort of protective prohibitive measures taken under 4D? And so then the question is, can we not consider that in the context of whether or not it's reasonable to have initially listed the species? I think, hopefully, maybe that gets it. We'll wait on it. Thank you. That's a much better articulation of my question. Again, the answer is no. And I guess I'd like to just say that the agency has to consider what factors Congress allows it to consider. And the effect of a listing decision is not a factor it can consider. And therefore, for the court to consider a factor is not consistent with state firms, not consistent with the structure of the ESA to consider whether listing is going... It's hard for me to describe this, whether listing is going to be beneficial to the species. And I'd just like to jump here because we... Well, you're burning up time too. I know. I know. Yeah, I'm sorry. Let me just say that Congress allows for listing of species, even foreign species, where there never are take prohibitions. There never are measures, remedial measures that the United States imposes. So Congress contemplated there would be a benefit just by listing the species and the agency identified that in its final rule that there are benefits even when there aren't compulsory measures. And we have the same problem here, do we not? In that the habitat is so broad that it includes foreign countries like Canada, Greenland, Iceland, Russia, that we obviously don't... Can't take any measures. Okay. Okay. Thank you. Good morning. May it please the court, Kristen Monselle for Intervenor Defendant Center for Biological Diversity. I just have two very brief points I would like to make today. One is how the best available science mandate of the ESA required the service to list ring seals. And the second is the important safety net that an ESA listing provides. There's already been a lot of discussion today about the bearded seal case and how that controls here. And that's absolutely the case. As was noted in the bearded seal decision, the ESA is concerned with protecting the future of a species, not just the preservation of existing animals. And so the service must make decisions based solely on the best available science. It doesn't require certainty or perfect data. The district court was troubled by the fact that the best available science leaves a whole lot of unanswered questions, not the least of which is at what point do we reach a tipping point with the species? And we're dealing with, as I said before, the record suggests millions of ring seals. So can you address the district court's concern? Because that seems like a pretty reasonable concern to me. Yes, your honor. And this answer I think relates to the 4D issue as well. The ESA establishes in section 4A the factors that the agency must consider in deciding whether or not to list a species and must base that decision solely on the best available science. That's what the agency has to look at in deciding whether or not to list a species. The statute does not require the agency to quantify the magnitude of the population losses or otherwise define an extinction threshold. So by doing so, both the district court and the plaintiffs are demanding the agency make additional findings that aren't required by the statute. Counselor, let me ask this question. At some point, is the information so incomplete and insufficient that it's not based upon best available data? When there's actually no data available, where do we draw that line? It seems to me one of the issues, following up on Judge Coleman's point, is really is at some point you can't fall back on it being just the best available data. If two-thirds of the information you need is either incomplete or unavailable, where do we draw that line? The statute requires reliance on the best available scientific data. And here, the best available science is the IPCC models on which the agency based its determination. And it is not the case that reliance on those models and that science means that every Arctic species will be listed. As was pointed out in the brief, the agency decided not to list ribbon seals and other ice species based on that same science. Here, there's broad scientific consensus that the habitat on which these species rely will be destroyed to the point at which they won't be able to survive. And your honors earlier discussed how the seal may be adaptable here, but the agency found that the seal wouldn't be able to adapt to its massive habitat losses because of its long generation time and ability to produce only one pup per year. So, the species wouldn't be able to survive these massive habitat losses. You would concede, would you not, and this is, I hate to be too blunt about it, but I will, suppose in my hypothetical that the district court had found that the agency's listing the species was to stop all drilling anywhere off the coast of Alaska. And the agency simply pointed to these studies as the justification for doing that, even though everybody admits it may be the best available science, but it doesn't answer some of these questions that the district court found fundamental. That would be an example of arbitrary and capricious decision making, would it not? If that was the sole basis on which the agency relied upon, but that's not the case here. It based its decision on climate change science, widely recognized as the best available science, as this court already recognized in the bearded seal case. And the listing provides several important protections to the seal, including the requirement to designate critical habitat, to ensure that its most essential But if the science shows that the Arctic ice cap is disappearing and that by 2100 it may be, for all intents and purposes, gone to the point that shipping will no longer require ice breakers in order to transverse the Arctic circle route, what can the agency effectively do to protect these species? Well, as it's recognized in the polar bear critical habitat designation, a critical habitat designation can help species threatened by climate change because it can motivate local ordinances that will conserve certain areas. And similarly with recovery planning. I'm not sure you're responding to my question. I mean, your premise is that the scenario on climate change projections is that by 2100, the ice cap as we know it may no longer exist. I mean, that has all kinds of implications worldwide for flooding Pacific islands and maybe even parts of Seattle. I don't know. But in that case, what can the agency effectively do? We think that there are mechanisms within the primary threat to the species such as section 7 consultation requiring the agencies to consult on actions that have a certain significance of greenhouse gas emissions, which could lead to the mitigation of those emissions. But as has already been discussed, the statute requires the agency to only consider the listing factors and the best available science. And that's exactly what the agency did here. So we ask that this court uphold the agency's decision. Thank you. Thank you very much. Good morning, and may it please the court. My name is Michael McBride with Van Ness Feldman on behalf of the Alaska Native Interests. With the court's permission, I'm going to take 23 minutes instead of 25 and leave seven for Mr. Steen. Okay, I'll try and help you. Thank you. I'm also appearing today on behalf of the state of Alaska, which does not have separate argument time. But Senior Assistant Attorney General Mayen is here on behalf of the state, if the court should have any questions. I want to hit head on the elephant in the corner, if you will. Why is this not the bearded seal case? And I'm going to do that first before any affirmative argument. But I even want to begin on a point that I think Judge Watford was asking more than once. Why is the snow even relevant here? There's a very good reason for that. This is a different habitat. It's not just a different species, different record, different peer reviews. We're going to get into that. It's a different habitat for this seal. The agency found, there's really no dispute about this, and I refer you to ER 124 and 307, that the ringed seal utilizes a broader range of sea ice conditions and is uniquely adapted to survive and remain in the heavily iced areas, which is a crucial distinction. It also builds layers on shore fast ice, that is the ice connected to land but over the water. And you'll find that at ER 131. So the point in the bearded seal case... The shore fast, I remember reading that it was the shore connected to like islands, which I assume didn't have any polar bears. Am I wrong about that? My understanding is it's shore fast ice. In other words, any part of the shore may have ice that extends... An island where there aren't any predators, so that's why they could do that there, as opposed to like the shore of the mainland, let's say, where I assume bears are roaming around. But the point is that the previous case, the bearded seal was based on models about the loss of sea ice. And accepting the premise for sake of argument here, that the sea ice will largely disappear, doesn't deal with the different habitat of the ringed seal. But are you making a resiliency argument here? Because are you saying that the difference in the habitat in terms of the shore ice is still going to be the same requirement as the case, but because the nature of the differences in the snow modeling that matters? Because there's an argument in the briefs about how resilient the ringed seal is. And that seems to be not as persuasive as an argument about the fact that they may be able, even in the current environment, with some of the modeling survive. And I'm not sure what argument you're making, because those are different. Thank you. A great question. And we're not just arguing resilience, we're arguing that this habitat for the ringed seal will be more sustainable than the sea ice habitat for the bearded seal. And why is that? And that is because the sea ice may disappear largely or completely depending on the time of the year. But the heavily iced areas and the shorefest ice, the models do not show will disappear. And therefore, the ringed seal habitat will survive, much more so, partially survive, Right, you're not saying it's going to entirely survive. I am not. And what portion of the habitat is going to be, as you claim, unaffected? Well, the agency itself claims to have relied on this Hazel study you heard about, and it says that more than 30 percent of the habitat, less than 70 percent of the habitat will be gone, based on that study. And in the I'm sorry, I want to make sure you understand, are you saying that 70 percent of the habitat will be gone, or 30 percent will remain? The agency said less than 70 percent will be gone, somewhat more than 30 percent will remain in the Hazel study. And then Defenders of Wildlife in this circuit, it was noted that habitat loss alone may not support a listing determination, and that even 82 percent of the loss of the habitat was insufficient to support a listing determination. We have far more than that here. But the point is that the ringed seal, heavily iced areas, shorefest areas, will survive even if the sea ice will not, at least to a large extent. And that's why the snow is important, Judge Watford, because you have ice for the snow to fall on and for the ringed seals to build their lairs. But you would concede that, as he suggested in the premise of his question, that it renders the seal more susceptible to predators like polar bears and grizzly bears and... Well, it may, but I think the government would have to concede, because it made the finding that there's no risk here of a substantial enough nature to warrant its concern about threatened with extinction before the end of the century. That was the agency's finding. Why would they have... What evidence would demonstrate that? I mean, unfortunately, you're both in the same situation. They may not be able to establish the extent of the population or the habitat, but it seems that you're equally unable to establish that it would be unreasonable for them to say that the population will not survive in a meaningful way in whatever 30% is left, right? I'm not sure. I'm quite flabbergasted, because we believe that with more than 30% of the habitat remaining by the agency's own finding, and by the way, the models don't model well for snow, and we'll get into that. She made a comment about Dr. Barber's commentary, and I'll deal with that, but I just want to say that the habitat will survive, and the models don't support a conclusion that the snow will disappear. They don't model for snow well. The experts said that, and therefore, there's ample basis to believe that the ring seal will have plenty of habitat. Believe it or not, even under the HESL study, the 30% or so figure, you will find this at SDR 11, 13, and 15. If you do the math, which is at SDR 13, it's 2.4 million square kilometers, which is just under a million square miles, which is the size about of Alaska and Texas put together. So that's the remaining habitat under the agency's own finding. That's an enormous amount of habitat, and there is other habitat in the rest of the world, as Judge Tomlin's questions earlier alluded to. So why is this not the bearded seal case? Different species, different habitat, as we've just discussed, different record, and different peer reviews. In the bearded seal case, this court noted at 840, fed 3680, that a majority of the peer reviewers supported the agency listing determination there. As Your Honor's questions referred to, four of the six here did not. All of the mammal experts did not. One expert did agree with the agency, but if you read his commentary, it's really, yes, you looked at the latest models. That's basically what he said. Pretty short. Yeah, and of course they looked at the latest models, but if the models don't adequately model what we're talking about, that's not adequate. Maybe you can respond to your opponent's argument that, was it the climate scientists, the three of those folks who were asked, two of them? They claimed two of the three support them. We read it more like one and not so sure about the other. The other one doesn't really quite come out and say he supports, but even if you want to give them the two out of three. Okay. All they really seem to say is, yeah, you looked at the latest climate models. We're not arguing they didn't do that. Why isn't that enough? The question I'm asking you is I'll ask the same question I asked opposing counsel, which is that they may be answering a different question, right? As scientists, whether or not the listing is supported in a scientific way such that you can draw conclusions is a very different standard than the deferential standard that we have to apply in the context of complex factual determinations by the agency and whether or not there's a reasonable basis for the listing. It seems to me that one of the difficulties you have to deal with is that it doesn't seem to me that the reviewers understood what the standard exactly was. How are we to interpret that? I think they actually, if your honor please, I think they understood it really quite well. It's eerie in some ways, actually. Well, I'm not sure how to look at it. We're still struggling with what the standard is. I mean, I think it's hard for you to imagine they understood it better than we did. I didn't mean anything like that. I'm teasing you. I actually think Judge Talman got it exactly right. I'm not trying to be obsequious here, Judge Talman, but in greater Yellowstone, I think you stated the standard quite well. And it's reasoned decision making, Judge Boulware. And I want to just read to you what Dr. Barber said. He complimented the agency on the status review. Said, and this is a quote, best evaluation available for the ring seal habitat assessment at this time. Notice that he characterized it as a habitat assessment. But then he pivoted immediately. This is at SCR 146 and said, I firmly believe that the results from this assessment do not provide an adequate basis upon which to consider the ring seal for consideration as a threatened species under the U.S. Endangered Species Act. Some of the other experts, Crack and Bush said that noted that the numbers of the Arctic ring seal, which by the way is the most numerous marine mammal species in the U.S. Arctic, are three to seven million, widely distributed across a large area and a variety of habitats. But I guess my question is, aren't those the factors that in fact, in the first version of this case, or the previous panel decided, aren't those exactly the factors that we're not supposed to be considering, that they're considering in terms of establishing the full extent of the population? At what point it will reach an extinction threshold? Aren't those the very factors at this point, given the previous panel's determination that we're not going to consider? I don't believe that at all, Your Honor. I've got the decision right here. And let me tell you what I think is critical there. In this, I'm now looking at page 683. The court adhered to Defenders of Wildlife versus Norton, the circuit's decision that evidence of habitat loss, as I've mentioned, without a reasoned explanation, there you go, providing a causal link between loss of habitat and species survival, was inadequate to support the listing of species as threatened. It then went on, however, to say that NIMS did not rely on habitat loss alone to justify its listing decision. Instead, the agency drew upon existing research to explain how habitat loss would likely endanger the bearded seal. So it found a causal link to support the second factor under the statute, which is whether the species would be threatened with extinction within the foreseeable future. So it concedes that habitat loss alone is not enough. That's precisely our point. And with the ring seals being 3 to 7 million, as opposed to 155,000 or so bearded seals, you have 20 to 40 times as many of these ring seals in your area, much different habitat. So the population is obviously important to determine whether the species is going to be threatened within the foreseeable future. Not though when the...equivalent with the projections as to whether they're accurate, but assuming that they are, not when the predation or the mortality rate of these single pups is almost 100% under the conditions that they predict will prevail. So if that's true, it doesn't matter how many you start with, in a very short time, you're going to get to zero or close to zero at that kind of rate of mortality, right? Excuse me. They didn't say within a very short time. They said by the end of the century. Yeah. And we said that's fine. But that's the reasonably foreseeable future. So you held...the other panel held that end of the century was enough with respect to models about sea ice alone. That was the habitat in question. And the point I'm trying to get across and hoping I'm getting across is this is a different habitat, different record, different peer reviews. The point being, therefore, that the heavily iced areas and the shore fast areas are not projected to disappear like the sea ice. And therefore, much more of this habitat is projected to remain. And snow is the issue and the models don't forecast well for snow and the experts said that. And if I may, they also...the HESEL study, which the agency cites and relies on here, and you heard it again this morning, talks about average snow depth. That's it. That's what those models are about. And the experts here had pointed out that it's not just average snow depth, 20 centimeters above or below, but it's also regional and localized differences, which the agency concedes at ER87 and 90 will occur to a great extent, and snow drifting, which the agency essentially concedes at those pages as well, because they build the layers in the drifts. And so even if average snow depth may be hypothetically inadequate, and the natives' comments say the ring seals are doing great even in areas where snow has diminished, but... Well, they wouldn't see the ones that actually weren't doing so well, right? Pardon me? I said they wouldn't see the ones that weren't doing so well, right? You're saying they see the ones that are doing well, but obviously the ones who are die of hyperthermia or killed off, right, they wouldn't actually see them. So you wouldn't be able to see the rate of decrease necessarily. You can't see the rate of decrease, but what you can see is this. You can see the exact opposite. You can see a very healthy species that's very robust and all sorts of the ring seals out there. And so the point is that if snow layers are the and the ice remains, and the models don't project that the snow will disappear, then what was interesting in the Trout Unlimited versus Loewen District Court opinion in 2007 at 645F subsecond 929, and I'm looking at page 957, and I think this is right on point for the court's questions. It's contrary to the record and the best available science for NIMS to rely on Oregon's viability conclusion in the face of peer review findings that the viability conclusion had insufficient scientific support. I think you can read these peer review comments here, and you'll see that they're saying that may be the best you could do at the time, but it's not good enough. And since the best available science standard is the standard, we don't dispute that they looked at the best available science. We're simply saying, as Your Honor held in Greater Yellowstone, there has to be an adequate basis for a listing or delisting decision, and we don't see it here. Now, why does this matter? And by the way, there are a number of other distinctions between bearded seal and this case, but among the most important points, and I refer you to excerpt of record 94 and 74, the agency concedes it does not how many ring seals there are, has no ability to detect population trends, little basis for quantitatively determining the relationship between environmental conditions or other factors and ring seal survival or reproduction. So they can say that, but they conceded the opposite in the record. I guess I just don't, again, I'm coming back to the same point I made before, that if we know that the mortality rate under certain conditions is 100% or close to that, why does it matter how many you start with, other than it's going to take longer, obviously, if you start with 3 million as opposed to 155,000, but eventually the species will be on the verge of extinction. The agency did not make that finding, and I think that's the point I was just making here. The agency says, in excerpt of record 94 and 74, it does not have any information about how many there are, what population trends may occur over time, and it has little basis for quantitatively linking projected environmental conditions or other factors to ring seal survival or reproduction. But that's not, that seems to be contrary to what the record before us says. I'm reading right from the record. That's what the agency said. Yeah, no, no, I'm talking about the mortality rate under the conditions that they're projecting will exist, right? Well, that's the reason why they say that even though there might be a lot of these animals today, by 2100, there are not going to be very many left. And I don't say, I don't agree the agency said that. In bearded seal, the agency said with sea ice gone, the habitat is gone. Okay, that was the finding there. That finding is not applicable here, and they didn't make a similar finding here. They conceded in response to Judge Boulevard's question, as I said, more than 30% of the habitat would survive, and they have no information about population. It made no finding whatsoever about what the population would be now or at the end of the century. Oh, well, we've already rejected that argument in the first decision. Then you guys think that's wrong. So we'll wait and see what the Supreme Court says, right? I don't object to you waiting to see what the Supreme Court says. I get that. But you rejected it with respect to bearded seal for a different habitat. And so the mortality assumption that if all the sea ice is gone, then all the bearded seals could die is the argument that was made there that the court accepted. I understand it doesn't apply here. This is a different case because the habitat's different. The ice will remain, and the issue here is snow, and the models don't project snow, and the agency doesn't know how many ring seals there are, doesn't know how many there will be, and it couldn't project how many there would be or draw a connection between habitat and population. It's a habitat case only. Mr. McBride, what do I do with the fact that the district court's language on summary judgment in both cases is almost word for word identical? Well, the standards de novo review, I think you owe the district court respect. He had the entire record in front of him. And the decisions, the listing decisions for both species, as I understand it, were made on the same day by the agency. I believe that's correct. So what do you do with it? I think the district court did the best it could. It determined that the best available science standard wasn't met here, that the reason decision-making standard wasn't met here, and that it needed to be vacated, as he did, and remanded to the agency, and nobody saw it and it's been back before the agency for almost two years, and that's where the matter stands. And so I think that you should know why this case matters to our clients. Our clients collectively represent the interest of the Alaska Native people, had a unique relationship with the ring seal since time immemorial. They depend on the use and development of their ancestral lands and waters to maintain their traditional way of life. The listing decision would allow NIMS to impose additional regulatory burdens. You heard about those from the center this morning, I think. Unnecessary infrastructure and economic activities, which threatens the ability of the Alaska Native interests to subside in the Arctic. Mr. McBride, I'm very sympathetic to the argument that you are making, and I think we are all very mindful of the relationship between the people and the land, particularly in Alaska, although it's true in other parts of the circuit as well. But the question I have for you is, in the absence of any 4D regulation, what additional regulatory requirements are now imposed on your clients by virtue of the decision? Well, let me refer you, perhaps the best example, to one of the declarations from Mr. Brower at SER 445. He lists several specific projects that are in various stages of consideration, funding, and what have you. And I'm sure your honor knows how short the building season is for a slope, all right? And so even brief delays associated with reviews and funding, Section 7 Consultation Council referred to, these matters then would require the other agencies who fund these projects, which all have a federal nexus up on the North Slope. So you have transportation, you have other agencies, the Army Corps, for example, permitting or otherwise regulating, and now they have to take into account the listing and consult with Commerce and take steps, if necessary, to do something on behalf of the ring seal that otherwise would not be required. This imposes cost and delay and may threaten the ability of the Native interests to even projects such as seawalls, water treatment, power plant renovations, and the like. They're all listed there, airports, landfills. Are you talking about current projects or future projects? Because it seems to me for future projects, you just have to build in this additional time, correct? Well, you may not be able to afford it. And once you build in the additional cost and delay, but these are projects that are now under consideration, that are discussed in the Brouwer Declaration and in the Glenn Declaration at SDR 450. You'll see discussion of a lot of other matters, including oil and gas development, which are ongoing and are affected as well. So, and these, the Native interests in the state obviously rely on the revenues from oil and gas development, and that's why those are so important. You may not know the answer to this question, but it's my understanding that Senator Murkowski was able to include a tax legislation. What is the effect of that, Ryder, if the president signs it into law? I left Washington before the bill passed, but I've been trying to follow it. I'm going to do the best I can. I'm saying this on information and belief. Based on what I read, first rough draft of history in the media, that the billion dollar appropriation for that is in the bill, in the Senate bill, right? And the effect of that would be to promote development of oil and gas in the Anwar region. But that doesn't address the delays that you. No, it simply provides some additional revenue, but the Section 7 consultations and the additional permitting obligations will cause additional cost and delay and may threaten these projects regardless. Okay. That's, that's the problem. I take your point. Okay. Oh, you wanted to save seven minutes for your. I wanted to save seven minutes for Mr. Steen. Can I just very quickly say that you can eat up his time. I don't want to eat up his time, but I can't sit down without saying what we want, what we think you should do and want you to do. Okay. We, we, we want you to affirm the district court and the listing as it was already remanded to the agency was the appropriate thing to do. It was vacated. We think that should remain in place and no one, the species will not be harmed by that because there is no current threat to the species. The threat is out at the end of the century. There is no harm to anybody but our clients by a reversal of the district court here and by allowing the listing to go into effect. And so we would ask you to consider very seriously that the agency really jumped the gun here. That's what happened. They didn't need to do this when they did it. They didn't adopt the species recovery plan because it wasn't necessary. They could have waited decades. The international union on conservation and nature and natural resources said it best. The species is on the least likely to go extinct list and that this matter should have been deferred and reassessed in a decade. Before you sit down, can you just give me the record sites again for the proposition that 30% of the seals? Oh yes. I'm happy to do it. FCR 11, 13 and 15. And if you want to see where the math appears, it's at SCR 13. And the 70% figure appears at the other two. SCR 1113. Is that the number you're giving us? I'm sorry. It's USSER. It's what the US put in with its reply brief. USSER 11, 13 and 15. And you'll find the math at 13 and the 70% figure at 11 and 15. Okay. Thank you. Thank you. Thank you very much. May it please the court. Ryan Steen from Stoll Reeves on behalf of the Alaska Oil and Gas Association and the American Petroleum Institute. I'm not going to bother with the podium because I've got time ticking. So I just want to highlight a couple of points that Mr. McBride highlighted and was questioned upon and try to answer some of your questions. This court's job is to look at the record in this case and determine whether there's a rational finding that the agency found that the species itself, not its habitat, would be threatened with extinction at the end of the century. But habitat reduction is one of the factors that can be considered. Habitat reduction is one of the factors, but there still must be a finding that that habitat reduction will affect the species in such a way that it will be in danger of extinction by the foreseeable future, which they found was the year 2100. And there are some distinguishing factors in this case from the Bearded Seal case. Mr. McBride mentioned a bunch of them. I think the peer review findings, if you look at the findings, they're cited in our brief at page 11 from four of the peer reviewers that disagreed, highlight some of those differences. Let me ask you this question. Even if all the peer reviewers disagree, does that mean matter if there is enough information for there to be a greater deference to the peer reviewer's determination? Couldn't the agency reject all the peer reviews if it thought there was information sufficient? Now, the fact that there's a certain number of peer reviewers who don't support the listing, does that matter if there's enough information in the record to support the agency's determination? It's not conclusive of it, but it is a factor, as Mr. McBride cited, that Shroud Unlimited case, where the court can find that the agency was arbitrary in going against the peer reviewer's rational explanation provided in the record. Here, we're saying that there is no rational explanation for finding that the seal species itself will be extinct by the end of the century. The agency's findings are right in line with that. This is a finding on SER 171. This is from the administrator of the Alaska region of NIPS talking about ring seal species. Again, the important factor is the response of the species to the projected habitat declines. He said, the principal threat to ice-associated seals is habitat alteration anticipated in the latter half of the century. The expected response, so this is the important point, the expected response of these seal populations to such habitat alteration is uncertain due to a paucity of data. It's our point that if something is uncertain, it is by definition speculative. The Supreme Court in Bennett v. Speer has said the agency is not allowed to make decisions claiming it's on the basis of the best available science if the finding it's supposed to make is uncertain. Another example from the record, this is at SER 201. It's the agency's own guidance that it apparently used because it's in the record to guide its listing decisions. In that guidance, they say that the agency should make a finding that in the foreseeable future, the species is likely to be at or near a qualitative extinction threshold below which depensatory processes dominate and extinction is expected. Then you couple that with the agency's own findings that it is claiming it's relying upon based upon the BRT review assessment. This is at ER 299 where they say the current population of Arctic ring seals is presumably large enough to avoid depensation, the standard that it referred to in its own guidance, combined with long lifespans and slow reproduction, a population of this size is not likely to experience extreme fluctuations that could lead to depensation and the threshold for depensation in seals is unknown. Again, we have an admission that there is uncertain evidence as to what's going to happen in this population. That's the basis for our case here. I think these findings in this record is what distinguishes it from the bearded seal case and why in this case, this court has the opportunity to distinguish that case. I see I only have a minute left. But it seems to me your main arguments, both of you basically, is that one difference here is the entire habitat is actually not going to be eliminated. I think the thrust of your argument is that since there's going to be potentially 30% of the habitat remaining that may be suitable, this case is different from the bearded seal case, right? That is one of the factors. From the record, we don't know. The agency didn't say if this habitat decline and the one study showing that seals could have 100% mortality said there'd be zero species left in 100 years. It didn't say if there would be out of the 3 million that might be 1 million left, if there would be 500 left, if there'd be 400,000 left. It didn't say. It just said based on that, we think it's going to be in danger of extinction. We're saying that's not enough. They don't have to identify a quantitative threshold, but they have to do some analysis. What would they have to do? I'm going to follow up on Jeff Watford's point, which is that if they're saying that the habitat is disappearing and mortality rate for the props is almost 100%, what else would they have to say or do to demonstrate that it was justification for the listing in your view? They need to do an analysis of what they think the population status will be. I think it's what their guidance that I cited right here says, make some finding other than a conclusory finding that it's likely to be in danger of extinction. Look at the available information. Look at how many ring seals they think are available and do some analysis of where the species will be at 100 years from now. How long did these seals live? Do you know? Uh, so I could be wrong on this, but I think it's 50 to 60 years. Okay. So pretty long line. Right. I could be wrong on that too. I'm just, I'm guessing. Yeah. I mean, they're not like they only for five years, right? I mean, I assume it's some right length of time, but that's, I guess they produce one pup per year and let's say a hundred percent of those for the foreseeable future are going to be killed. It just seems to me, it doesn't, you could do the math to figure out, I guess, if you started with a population of say 3 million today, how long it would take before the number got to zero, but it would get to zero with a hundred percent mortality. That's my only point. So we can quibble about whether the year is 2100 or sooner or later, I guess, but I don't think there's anything irrational about saying that if we predict that certain conditions will produce a hundred percent mortality rate, that the species is going to get to the danger of extinction. That just seems, yeah, no doubt. And the explanation that your honor just gave is more than the agency gave in its own record. It never found that that one study where they observed a hundred percent mortality meant that every single seal that was born, say 50 years from now, would die and then the population would go to zero. None of that is in the record. They noted the study, but there's no analysis of what would happen to the population. And the ESA requires them to review a status of the species and make determinations about what will happen to the species in the foreseeable future. Their statute says they have to do that, and that's not what was done here. Well, the hundred percent mortality was based on an assumption that the snowfall on ice is less than the numbers we were talking about earlier, 20 to 30 centimeters per year. But if you look at the projection that says there will be at least 70 percent, I'm sorry, 30 percent remaining worst case scenario at 2100, then by definition, you couldn't have a hundred percent mortality, right? And again, that's not, the agency didn't make that finding in its record, and it didn't, it's speculation. No, no, no, no, but I'm just, yeah, this is not an unfriendly question. I'm just trying to tease out Judge Watford's question. I think the answer though, is that you're saying 30 percent of the ice will remain, but they're saying that doesn't matter because there's not enough snow. So that the mortality rate will be a hundred percent, even if 30 percent of the ice remains. That's what I'm assuming we're going to hear in a second. They're saying that, but again, they didn't make a finding that the mortality rate of the species would become a hundred percent based on that. They described the study that made that finding, but they didn't say the mortality rate for the species in some period of time is going to be a hundred percent. They didn't do that analysis. When the pups have to be birthed through, I don't know what this term is, but you know, and they have to be born and they're out on open ice, right? In that condition, the mortality rate is a hundred percent because they'll either succumb to hypothermia or they'll get, they'll succumb to predation. So all we're trying to figure out is were they rational in saying that that set of conditions in a hundred years or 85 years, whatever, is going to exist, that there are going to have to have their pups out on open ice or open land, whatever's left. That, to me, is the only question. And as long as they're rational in saying that that set of conditions is likely to prevail in 2100, then it's rational to say it's going to go to zero because the mortality rate in those conditions is a hundred percent. And we're saying that's not rational because they didn't show their math. They didn't draw that connection as it required. There's no math to be done. I guess that's why I'm just not persuaded by your point. There's no math to be done in that set of circumstances. Is there? Here's an example. If you look at the decision on the polar bear listing or it listed the species, Fish and Wildlife Service listed the polar bear as a threatened species. There were similar findings based on actually more studies showing that polar bear cubs die if they don't have certain levels of snow and habitat to form layers where they're, where they're born and then reared. So it had that finding and it had a lot more studies that it had than NIMS had for the ring field showing how that occurs. The Fish and Wildlife Service, though, didn't just stop and say, oh, therefore the polar bear is a threatened species in, you know, 50 years. They did math. They said we have this information. We are going to look at the species and we are going to do some population modeling to see where do we think this, what does this mean for the population? And they looked at four different time frames extending to the year 2100 and the worst one showed that polar bear species could decline to about 80% of its current or 20% of its current level, 50%, 60% on down. It looked at all that information. It looked at where it said the population would be, the effects that it was observing biologically on the species and what that said about its habitat and what that could mean for the polar bear. And it made a decision that the court found was a rational decision about what that could mean for the species of the polar bear. And we're saying that here, NIMS didn't do anything like that. Even if they had less data about the ring seal population, they didn't do any analysis about what does this information we have mean for the species? And we're contending that it's not enough just to say we have a study that showed you could have 100% mortality and then conclude that the species that one of its peer reviewers noted is 3 to 7 million in 100 years is going to be in danger of extinction. That is speculative. It's speculative decision-making. It's not scientific and it doesn't have a rational basis. And just so I'm clear, your argument was, at least Mr. McBride's argument was, that if at the end of 2100, we are still left with 30% of the available habitat to support the species, then by definition, you couldn't have 100% mortality of the species. Correct. By definition, you couldn't, if there still is habitat available in the form of short-cast ice and et cetera. Okay. Thank you. I had more prepared about how it doesn't make sense in the context of the statute, but I think my time is over. You went over seven minutes, so we're almost at noon here, so I think we'll let the other side rebut and we'll be done for the day. Thank you, Your Honor. I appreciate it. Hi. I have a few points I'd like to address. Well, counsel, what would be helpful is to address, I think, this issue about the 30% and whether or not this is about the ice or the snow, because I think there's some confusion about whether or not the 30% means simply 30% of ice available for snow to be deposited on or whether or not the 30% is ice with the appropriate level of snow for the snow case to be able to be formed to avoid hypothermia and predation. Okay. Great. Well, NIMS did not find that 30% of the habitat would remain. NIMS concluded that there would be a few remnant areas of suitable habitat, and those are in the Canadian archipelago and in the Arctic basin, and in a few small, either isolated areas. The 30% figure that he's using is from the Hazel study. NIMS did not adopt this 30% figure. I just want to be clear about that. Well, wait a second. I thought you pointed us to the Hazel study as effectively rebutting the peer reviewers, at least Dr. Barber's. They're mocked. But both ways, counsel. Either it supports the agency's position or it contains some information that might actually support the other side. Now, let me clarify. Okay. Yeah, please do. So there are 10 models in the Hazel study. They all supported NIMS model. So there are no models that disagree with the NIMS conclusions. The Hazel model said that there would be a 70% reduction of habitat north of 70 degrees. Okay? A lot of the seal's habitat is south of 70 degrees. Right. So that means a greater than 70% reduction, because the areas south of 70 degrees are already going to be lost. Are you following me? Yeah, but I'm looking at a species that basically covers the Arctic cap. So there's still a lot of land north of 70 degrees, counsel. Let me be clear here. So what Hazel found is that there would be a 70% reduction in the habitat north of 70 degrees. That means there's already a loss of the Bering Sea, Hudson Bay, many other regions that are currently habitat that are not factored in at 70%. Isn't 30% inside the Arctic circle still several hundred thousand kilometers square? I think the answer is yes. Yeah. I mean, yes. There's going to be some – their forecast is that there will be some habitat left. But the question is not whether the species will be extinct in 2100. The question is whether they will be in danger of extinction in 2100. The threatened standard is whether they're likely to become endangered in the foreseeable future. But 30% of 3 million would be 900,000, would it not? Well, you can't just – their habitat is not just a matter of square miles. Their habitat has to do with availability of food, with the snow cover, and the areas that will be – at the turn of the century are areas that they do not know will be suitable. Like the Arctic Basin, that's not currently used by seals for popping. It's not available for seals for popping. They don't know what species of food will be available to them. So that's why they characterize it as a few remnant areas will remain. Do you know, percentage-wise, what the 30% north of whatever that point you said is, what that represents in terms of the totality of the seals' current habitat is? No, I don't. NIMS didn't calculate it. I thought there was a diagram in the record that shows basically much of the polar ice cap – or the Arctic ice cap is inside the Arctic Circle. Yeah, I mean, here – Didn't I see that? Yeah. I thought I did. Yeah, it is. I mean, the Arctic Circle is at 66.6 degrees. That's what – that's what I'm saying. Which – Oh, you haven't seen the bench memo. 127. I don't want to get lost in the details here, but I think it's important to consider that they are – they are suggesting that if there's 30% – an area of 30% left, which is an overstatement of what will be left, because it doesn't – But we're talking about the difference between 70 and 90 degrees, right? Isn't 90 the pole? I think it is. Yeah. My geography or geology is a little weak. But the last time I looked at a globe, I think it's 90 degrees above the equator, 90 degrees south. I think you're – I think I'm not expressing myself clearly here about – But we're talking about north of latitude 70 degrees, right? That's what Hazel was talking about. Right. Okay. That doesn't include a lot of the field's habitat, which is south of 70 degrees. Right. We understand. Okay. Yeah. We understand. Right. And then the other thing, just to clarify, that's just talking about the existence of ice. No, that's the snow. I'm sorry? That's snow on ice. Snow on ice. Okay. Got it. Okay. The statement that the agency did not assess the risk to persistence is not true. The agency stated that it relied on two risk assessments. And so it made an assessment of the severity of the threat. It's – the analysis here is very similar to the analysis in the Bearded Seal case. In that case, likewise, the agency did not have information on population numbers. It also – the – Where did the – where did the 157,000 come from in the Bearded Seal case? It didn't – they didn't have reliable information on – they made estimates, but they didn't have reliable estimates of the population. That's a pretty specific number. I don't – I can't respond to that because I don't have that record in front of me. All right. But in that case, there were – there was going to be ice left. Their argument that the shorefast ice will remain, and that's different from the sea ice, that's just not accurate. The sea ice extent measured here and in the Bearded Seal case measures shorefast ice, sea ice that is not shorefast, and all of the ice. So I really have no idea what they were talking about, but it doesn't – Well, it also includes ice on freshwater, like lakes, doesn't it? No. I thought I read somewhere in the record that the species can actually pup on snow on – Those are other subspecies. Not this species. Not the Ringed Seal. Not the Arctic Ringed Seal. Other subspecies of Ringed Seal. Okay. The standard is substantial evidence, and I think the plaintiff's argument here is very disturbing because I think the question arises, what does an agency have to do to make a determination? It has to make a rational determination. I guess the question is, when your best available science is not able to answer some of the questions that we've been wrestling with, is that substantial evidence to support the agency's decision, or is it just an arbitrary and capricious ruling? Isn't that the question? Well, I guess I – the question is, yes, there has to be – it has to rely on the best available science, and there has to be substantial evidence, but that's evidence – But it has both. You do. Yeah. Right. Okay. And we think – So the question is whether or not what they had – and I guess our panel in Pritzker said that was best available science, but then the question becomes, is that substantial enough evidence? That's the issue that we're wrestling with. Right. And in Pritzker, they said, yes, it is adequate evidence. It's substantial evidence. It's a standard that they applied there. The agency merely needs to be able to make a determination that the species is likely to become endangered. It doesn't have to be able to quantify the population decline. Right. In Pritzker, I also thought that they said it likely was a common-sense determination, right? It was not the specific probabilistic determination, right? Exactly. Right. And as the model – I mean, it seems like a lot of the questions from the panel have been about the reliability of the SNO modeling. And there are 11 models all showed the same decline projected to 2100. Those were truth against three observational studies for NIMS model, two other observational studies for those 10 other models. So the fact that some of the peer reviewers thought it was important to have localized information or more studies or more details or whatever, I mean, that does not undercut the fact that all of the studies had the same results. Okay. I've let you both go substantially over. Unless you have one more point that you really need to make before we go, I think we're done. One more point I'd really like to make. Thank you. You would be the first lawyer in history not to take me up on that. Go ahead. The plaintiff's counsel said that there was only one study that showed seal mortality at nearly 100 percent. I'd like to say there are six studies that showed seal mortality, and those are from widely disparate areas of the seal's habitat. Thank you. Thank you very much. The case was very well argued. It is submitted for decision. We'll probably get out an order essentially vacating or deferring submission on the case to a white Pritzker, but we'll talk about it in conference. We'll let you know. We are adjourned for the day.
judges: Tallman, Watford, Boulware